# ⁀HENKEL *v.* UNITED STATES.

**ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.**

No. 142. Argued January 20, 21, 1915.—Decided April 5, 1915.

There is no question of the authority of the United States to devote the Indian lands involved in this action to irrigation purposes.

Under the provisions of the Reclamation Act of June 17, 1902, the Secretary of the Interior had power to acquire all rights and property necessary therefor, including those of allottee Indians, by paying for their improvements and giving them the right of selecting other lands.

The restrictions on alienation of lands allotted to Indians within the area of the Milk River Irrigation Project did not extend to prohibiting an allottee Indian from selling his improvements to the United States and selecting other lands so that the United States could use the lands selected for purposes of an irrigation project as provided by act of Congress.

In this case *held* that the mother of Indian minors whose father was not an Indian was the natural guardian and her relinquishment of the original allotment on their behalf was proper and binding.

196 Fed. Rep. 345, affirmed.

THE facts, which involve the rights of allottee Indians and the power of the Government to purchase improvements and make new allotments where the land allotted is needed for reclamation purposes, are stated in the opinion.

*Mr. Thomas J. Walsh* for plaintiff in error.

*Mr. Assistant Attorney General Wallace, Jr.,* for the United States.

MR. JUSTICE DAY delivered the opinion of the court.

This suit was an action in ejectment brought by the United States in the United States Circuit Court for the

District of Montana, to recover certain lands in the Black-feet Indian Reservation. The defendants (now plaintiffs in error) other than Henry Henkel are members of the Piegan Tribe of Indians. Henry Henkel is the husband of Caroline Henkel and the other defendants to the action are their children. They lived together as a family and occupied the lands in question, upon which they had constructed certain buildings and improvements. On November 5, 1906, Caroline Henkel, for herself and two daughters, together with her two sons George Henkel and William Henkel, executed a document addressed to the Commissioner of Indian Affairs, by which, describing themselves as members of the Piegan Tribe of Indians, they undertook to relinquish all claims to lands and buildings then occupied by them on the Blackfeet Indian Reservation, Montana, comprising about 800 acres of land, the lands being situated at the foot of Lower St. Mary Lake, and south of Swift Current Creek. The con-ditions of the surrender of the lands for use in connection with the proposed St. Mary Reservoir of the United States Reclamation Service were that they should be paid the sum of $7,500 for the improvements on such selections, and be subsequently allowed to select allotments of equal area, or as provided by law, from the unoccupied lands of the Blackfeet Reservation in Montana. Henry Henkel, as husband and father, concurred in the agreement and en-dorsed his approval thereon.

On February 15, 1907, the price named in the instru-ment just referred to, seven thousand five hundred dollars, was paid to Caroline Henkel, who for herself and two daughters, and George and William Henkel, for them-selves, relinquished to the United States all their right, title and claim in and to the lands and buildings then occupied by them on the Blackfeet Indian Reservation, Montana, and located at the foot of Lower St. Mary Lake and south of Swift Current Creek, and released the United

States from all claims for damages to all improvements of whatsoever nature on the land. This receipt and release was also agreed to by the husband, Henry Henkel.

These facts are set up in the complaint, and it is averred that pursuant to the Act of Congress of June 17, 1902, c. 1093, 32 Stat. 388, the Government had made investigations of and surveys for an irrigation project which was known as the Milk River Irrigation Project, under and by virtue of which certain lands in the northern part of the State of Montana were to be irrigated; that among other works forming part of the system to be established, a dam was to be built at the foot of the Lower St. Mary Lake, by which the lands above mentioned, and now in controversy, were to be flooded, and that the same were necessary for flooding in connection with the reclamation project above referred to.

The defendants answered, admitting the execution and delivery of the instrument above referred to, and the payment of the money, as recited in the release and receipt. They averred that they were all members of the Piegan Tribe of Indians, except Henry Henkel, and had the right as such Indians to be upon the Blackfeet Indian Reservation; that they had settled upon the lands in question more than ten years before the beginning of this suit, which, since a recent survey, were designated by congressional subdivisions, and embraced the land in controversy, and ever since their settlement upon said lands they had occupied the same in common as their home, and since the passage of the act of March 1, 1907, c. 1015, 2285, 34 Stat. 1035, opening the reservation to settlement, they had selected such lands as their allotments under that act, the lands being grazing in character. The answer sets out the selection of each of the defendants entitled to allotments and it is alleged that each acquiesced in the selection made by the other. The answer then avers that the allotting officers had refused to allot the lands in

question to them, but that under protest William Henkel, George Henkel and Lizzie Henkel had been allotted lands elsewhere, which lands they offered to surrender if the lands selected by them should be allotted to them; the refusal to allot such lands, as the answer avers, being based upon the instruments referred to in the complaint. The answer averred that the lands were at all times since the execution of these instruments worth more than the price offered by the Government, which sum the defendants offered to return.

To this answer a demurrer was sustained by the court, and the plaintiffs in error electing to stand upon the answer, judgment was rendered accordingly, awarding to the United States the possession of the premises. The case was taken to the Circuit Court of Appeals for the Ninth Circuit, where the judgment of the lower court was affirmed. 196 Fed. Rep. 345. The case is now here upon writ of error.

The contention of the plaintiffs in error, defendants below, is that no statute of the United States has conferred authority upon the Government or its officers to acquire the lands described by the relinquishment from the Henkels, as above set forth. Such action, it is contended, would amount to an act of bad faith upon the part of the Government toward these Indians, in view of their established rights in these lands; and to permit the reclamation statute of 1902 to have such effect, it is insisted, would be virtually to permit it to repeal previous acts of Congress disposing of these lands for the benefit of the Indians.

A consideration of these matters requires some examination of the previous status of the Indians and what Congress has undertaken to do by legislation in their behalf.

By the act of February 8, 1887, c. 119, 24 Stat. 388, as amended February 28, 1891, c. 383, 26 Stat. 794, authority was given to the President, as to any reserva-

tion which he should consider advantageous for agricultural or grazing purposes, to allot, after survey thereof, "to each Indian located thereon one-eighth of a section of land"; and if the lands allotted were valuable for grazing purposes only, to allot to each a quarter-section of land. Allotments, which were to be set apart under the provisions of the act were to be selected by the Indians, heads of families selecting for their minor children, in such manner as to embrace the improvements of the Indians making the selection. Upon the approval of the allotments by the Secretary of the Interior, patents were to issue therefor, in the name of the allottees, which patents should declare that the United States would hold the lands thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indians to whom allotted, and that conveyances of land set apart and allotted as provided in the statute, or any contract concerning the same, before the expiration of the time above mentioned, should be null and void. In that act it was provided that nothing therein contained should affect the power of Congress to grant the right of way through any lands granted to an Indian for railroads, or other highways or telegraph lines, for the public use, or to condemn such lands to public uses upon making just compensation.

On September 28, 1895, an agreement was made with the Indians (29 Stat. 353) which was approved by the act of June 10, 1896, c. 398, 29 Stat. 321, 355. Article V of that agreement provides as follows:

"Since the situation of the Blackfeet Reservation renders it wholly unfit for agriculture, and since these Indians have shown within the past four years that they can successfully raise horned cattle, and there is every probability that they will become self-supporting by attention to this industry, it is agreed that, during the existence of this agreement no allotments of land in

severalty shall be made to them, but that this whole reservation shall continue to be held by these Indians as a communal grazing tract upon which their herds may feed undisturbed; and that after the expiration of this agreement the lands shall continue to be held until such time as a majority of the adult males of the tribe shall request in writing that allotment in severalty shall be made of their lands:" provided, however,

"That any member of the tribe may, with the approval of the agent in charge, fence in such area of land as he and the members of his family would be entitled to under the allotment act and may file with the agent a description of such land and of the improvements that he has made on the same, and the filing of such description shall give the said members of the tribe the right to take such land when allotments of the land in severalty shall be made."

While the Henkel family had occupied this 800-acre tract, it does not appear that they had filed a description of the land and improvements with the agent, so as to give them the right to take such land when allotment of the same should be made. Nevertheless, they would have a strong equity for recognition, in view of their settlement upon the land and construction of improvements thereon, and but for the relinquishment relied upon in this case, they might perfect their right to the allotment. It is to be noted, however, that this agreement, in article VII, contains an important recognition of a reserved right of the Government to use the lands upon compensation being made therefor, for certain public improvements. As it is therein provided, 29 Stat. 356 "whenever, in the opinion of the President, the public interests require the construction of railroads, or other highways, telegraph or telephone lines, canals and irrigating ditches, through any portion of this reservation, right of way shall be and is hereby granted for such purposes, under such rules, regulations, limitations, and restrictions

as the Secretary of the Interior may prescribe; the compensation to be fixed by said Secretary and by him expended for the benefit of the Indians."

While the plaintiffs in error were thus occupying the lands under this agreement and statute, the Reclamation Act of June 17, 1902, c. 1093, 32 Stat. 388, was passed. That act outlines a comprehensive reclamation scheme, and provides for the examination and survey of lands and for construction and maintenance of irrigation works for the storage, diversion, and.development of water for the reclamation of arid and semi-arid lands. Section VII of that act provides (p. 389)—

"That where, in carrying out the provisions of this act, it becomes necessary to acquire any rights or property, the Secretary of the Interior is hereby authorized to acquire the same for the United States by purchase or by condemnation."

Section X of the same act provides—

"The Secretary of the Interior is hereby authorized to perform any and all acts . . . necessary and proper for the purpose of carrying the provisions of this act . . . into effect."

In 1902, preliminary surveys for the Milk River Reclamation Project were begun by the Reclamation Service, and the boundaries of the St. Mary Dam and its right of way for flooding area were outlined. On February 28, 1903, the Secretary of the Interior, on recommendation of the director of the service, withdrew, under the terms of the Reclamation Act, a strip of land one-half mile wide around lower St. Mary Lake and on each side of the river, after which construction was authorized and a large amount of work has since been done.

The authority of the Congress of the United States to devote these lands to irrigation purposes is unquestioned. As a matter of fact, it might, if it saw fit, remove the Indians therefrom and devote the land to such uses.

Recognizing the injustice of arbitrary appropriations to other uses, no effort has been made to take these lands without compensation to the Indians for the improvements which they have made, and they have been given the right to select other lands in place of those released. The reclamation projects undertaken by the Government are very extensive, and cover many States; and they must involve in their construction, the flooding of lands in connection with dams designed to hold water for such purposes; and must necessarily include much territory which is included in Indian reservations. This situation was of course well known to Congress when it passed the Reclamation Act, and we cannot doubt, in view of the broad authority conferred by §§ VII and X above quoted, that it was the purpose of Congress to give the Secretary of the Interior the right to acquire such rights as are here involved, when necessary for reclamation purposes. In carrying out the purposes of the act, the Secretary of the Interior is authorized to acquire any rights or property necessary for that purpose, and to acquire the same, either by purchase or by condemnation. He is specifically authorized to perform any and all acts necessary and proper for the purpose of carrying into effect the provisions of the act. Authority could hardly have been conferred in more comprehensive terms, and we do not believe it was the intention of Congress, because of the Indians' right of selection of lands under the circumstances here shown, to reserve such lands from the operation of the act. To do so might defeat the reclamation projects which it was evidently the purpose of Congress to authorize and promote. The Secretary of the Interior, in interpreting this act, dealt fairly with the Indians in so far as this record shows, paid them for the improvements they had put upon the lands, and gave them the right to select other lands which might be open to allotment, of equal area, as provided by law, from the unoccupied lands

of the Blackfeet Indian Reservation. In so doing, we think· he acted within his authority, and was executing· the purposes intended by the act of Congress to which we have ·referred.

The Circuit Court of Appeals in its decision laid emphasis upon the case of *Williams* v. *First National Bank,* 216 U. S. 582, in which this court recognized the right of one Indian· to surrender and relinquish to another Indian a preference right to an allotment of a tract of land. In that case it was held that one Indian might sell his improvements and holdings to another Indian for allotment, and lay his own on other land which he might find vacant, or which he·might, in turn, purchase from another Indian, and the Circuit Court of Appeals held that, this being so, as a matter of course, and for stronger reasons, an Indian might relinquish his rights to the United States, and that restrictions had been placed upon the power of the Indians to alienate their lands or convey their rights of·possession only for their protection, and not for the purpose of restricting their right to deal with the United States or to relinquish their rights to the Government, citing *Lykins* v. *McGrath,* 184 U. S. 169, and *Jones* v. *Meehan,* 175 U. S. 1. Without questioning the correctness of this reasoning, we think the purpose of the United States to acquire any property necessary for the reclamation project embraced such transactions as the Secretary had in this case with the Indians, and the action which he took under the authority conferred by that act wholly justified all that was done in the premises.

As to the contention that the daughters for whom the mother signed are not bound by the release: The mother undertook to act for them as minors, and there is nothing to indicate that they were not such, as there is no allegation· in the answer to which the demurrer was sustained that they were adults and therefore capable of acting for themselves. The references to the regulations of the ·

Interior Department, which are called to our attention by the Government, show that that Department has uniformly required the interest of minors to be represented by the natural guardian, which in this case was the mother. There is no court to which they could have applied for the judicial appointment of a guardian, and we see no reason to question the legality of the practice of the Department in this respect. A communication from the Acting Commissioner of Indian Affairs, attached to the Government's brief, declares that that office and the Interior Department have uniformly held that the natural guardian could execute valid relinquishments in behalf of minor children, and we see no reason why this authority should be questioned.

We reach the conclusion that the Court of Appeals did not err in affirming the judgment of the Circuit Court, and its judgment is accordingly

*Affirmed.*

MR. JUSTICE MCREYNOLDS took no part in this decision.