UNITED STATES of America,
Plaintiff,

v.

5,677.94 ACRES OF LAND, MORE OR LESS, OF THE CROW RESERVATION, STATE OF MONTANA, The Crow Tribe of Indians of Montana, William A. Wall, Chairman, James Real Bird, Vice Chairman, and Phillip Beaumont, Secretary, Crow Tribal Council, et al., and unknown owners, Defendants.

Civ. No. 1825.

United States District Court
D. Montana,
Billings Division.

May 15, 1958.

Krest Cyr, U. S. Atty., Butte, Mont., Dale F. Galles, Asst. U. S. Atty., Billings, Mont., Robert R. MacLeod and Anne S. Bell, Dept. of Justice, Washington, D. C., for plaintiff.

Burton K. Wheeler and Robert G. Seaks, Washington, D. C., Bert W. Kronmiller and Douglas Y. Freeman, Hardin, Mont., for defendants.

Arthur Lazarus, Jr., Washington, D. C., Richard Schifter, Washington, D. C., and Strasser, Spiegelberg, Fried & Frank, New York City, of counsel, amici curiae.

JAMESON, District Judge.

This opinion will consider (1) whether the United States has authority to condemn tribal lands of the Crow Tribe of Indians for the construction of Yellowtail Dam (presented by renewal of defendant's motion to dismiss); (2) whether water-power value should be allowed in determining just compensation; (3) whether the issue of just compensation should be tried before a jury or commissioners (presented by plaintiff's demand for a jury trial); and (4) whether the question of the navigability of the Big Horn River should be determined by the court.

Authority of United States to Condemn
Tribal Lands.

Defendants' motion to dismiss was denied by the Honorable Charles N. Pray on January 8, 1957. Judge Pray's opinion is reported in D.C., 152 F.Supp. 861. While his decision is not res judicata, under the rule of comity it should be followed except "for the most cogent reasons". Plattner Implement Co. v. International Harvester Co., 8 Cir., 1904, 133 F. 376. After reviewing the authorities cited in the able briefs filed by counsel for both parties and, in particular, the cases decided subsequent to Judge

Pray's opinion, I reach the same conclusion as Judge Pray, i. e., that the United States has the right to condemn the property in question and that the motion to dismiss should be denied. On this question this opinion is supplemental to Judge Pray's opinion of January 8, 1957.

■ Defendants rely upon the treaties between the United States and the Crow Tribe of Indians and particularly the provisions of the Treaty of May 7, 1868, confirming the aboriginal title of the Indians and providing that certain lands of the Crow Indians were set aside for their absolute and undisturbed use and occupation.[1] It is clear, and defendants do not contend otherwise, that the power of eminent domain may be exercised over Indian tribal lands regardless of treaty provisions. Cherokee Nation v. Southern Kansas R. Co., 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295.[2] The question is whether there is sufficient authorization—general or specific—for the condemnation of the particular tribal lands in question. In other words, are the statutory enactments subsequent to the execution and re-affirmation of the treaties with the Crow Tribe sufficient to manifest an intention of Congress to override the effect of those treaties and permit this condemnation?

■ While general acts of Congress do not apply to Indians unless so expressed as to clearly manifest an intention to include them (Elk v. Wilkins, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643), general legislation is sufficient to override the provisions of an Indian treaty where the intention of Congress to do so is clear.[3]

Sec. 9(c) of the Flood Control Act of December 22, 1944 (58 Stat. 887, 891) directed that the reclamation and power developments of the Missouri River Basin project, which includes Yellowtail Dam, be governed by the Federal Reclamation Laws, i. e., Act of June 17, 1902, and Acts amendatory thereof or supplementary thereto (32 Stat. 388, 43 U.S.C.A. § 371 et seq). The continued prosecution of the Missouri River Basin project was reaffirmed in the Acts of July 24, 1946 (60 Stat. 641, 653) and of May 17, 1950 (64 Stat. 163, 184). The Reclamation Act was construed in Henkel v. United States, 237 U.S. 43, 35 S.Ct. 536, 539, 59 L.Ed. 831, where it was held that reclamation projects under the Reclamation Act "must necessarily include much territory which is included in Indian reservations", and the court could not doubt in view of the broad authority conferred by the Act that it "was the purpose of Congress to give the Secretary of the Interior the right to acquire" such lands, when necessary for reclamation, either by purchase or by condemnation. Basic authority for condemnation is also contained in the general condemnation act of August 1, 1888 (25 Stat. 357, 40 U.S.C.A. § 257). See Judge Pray's opinion and cases there cited (152 F.Supp. at page 863).

Moreover, "the statutory authorization to procure real estate may be evidenced by the making of an appropriation as well as by a specific authorization to acquire". Polson Logging Co. v. United States, 9 Cir., 1947, 160 F.2d 712, 714. See also Judge Pray's opinion and cases therein cited. Subsequent to the authorization legislation, Congress appropriated for preconstruction work on Yellowtail Dam for five consecutive years,—1947 (60 Stat. 348, 368), 1948 (61 Stat. 460, 476); 1949 (62 Stat. 1112, 1129), 1950 (63 Stat. 765, 783); and

1. See Fort Laramie Treaty of September 17th, 1851, (11 Stat. 79, Vol. II, Kappler, Indian Affairs, Law and Treaties, p. 594) and the Treaty of May 7th, 1868 (15 Stat. 649, Vol. II, Kappler, p. 1008).

2. See also Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299; Henkel v. United States, 237 U.S. 43, 35 S.Ct. 536, 59 L.Ed. 831; United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209; and The Seneca Nation of Indians v. Brucker, D.C., 162 F.Supp. 580.

3. See Spalding v. Chandler, 160 U.S. 394, 16 S.Ct. 360, 40 L.Ed. 469; Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S. Ct. 115, 47 L.Ed. 183; The Seneca Nation of Indians v. Wilber M. Brucker, etc., supra.

1951 (64 Stat. 595, 686). Under a general appropriation bill, (Public Works Appropriation Act, 1956, 69 Stat. 354, 357) Congress appropriated $4,000,000 for initiation of construction work on Hardin unit (Yellowtail Dam).

The authorization and appropriation measures and committee reports relating thereto lead inescapably to the conclusion that Congress knew and intended that tribal lands of the Crow Tribe of Indians would be required in the construction of Yellowtail Dam.

Two cases have been decided by other courts subsequent to Judge Pray's decision. In The Seneca Nation of Indians v. Brucker, D.C.D.C., 162 F.Supp. 580, 581, the Indian tribe contended that "general acts of Congress do not affect Indian Treaty rights" and that "they (general acts of Congress) do not nullify previous special acts whether in the form of legislative enactments or treaties." The Court said: "A review of the authorities indicates that the test is not whether the Congress has acted by general legislation or special acts, but whether, whatever the form of the legislation, Congress has manifested an intention to include Indian treaty rights in the legislation." It was held in that case that an appropriation act of Congress earmarking one million dollars for the construction of the project for which the Indian land was sought to be condemned "manifested a clear Congressional intention to authorize the construction of the project." [4]

In the other recent case,—United States v. 2005.32 Acres of Land, More or Less, Situate in Corson County, South Dakota, and Sioux Indians of Standing Rock Reservation, the District Court of the Northern District of South Dakota, 160 F.Supp. 193, recognized the authority of Congress to exercise the right of eminent domain over Indian tribal lands, but held that Congress had not exercised its authority in that case and granted the defendant's motion to dismiss. The project in that case was prosecuted by the War Department pursuant to Sec. 9(a) of the Flood Control Act of 1944 and prior enactments and not by the Department of the Interior pursuant to the Reclamation Act of 1902 as amended. While the case is also distinguishable in some other respects (and was distinguished from Judge Pray's prior opinion by the court there) it does support defendants' position here.

Defendants contend further that there are three specific statutory prohibitions against the Government's right to condemn: (1) the Crow Allotment Act of 1920 (41 Stat. 751) which provides in Section 8 that "no additional irrigation system shall be established or constructed by the Government for the irrigation of Indian lands on the Crow Reservation until the consent of the tribal council thereunto has been duly obtained;" (2) the 1926 Amendment (44 Stat. 658, 660) which prohibited an irrigation system "unless and until" the Crow Tribe consented; and (3) the 1946 Act on Crow Matters (60 Stat. 333) which provided in Section 9: "No further construction work on the Crow Indian Reservation shall be undertaken by the United States without the prior consent of (1) the Crow Tribe, * * * The consent of the Crow Tribe shall be obtained by a majority vote of the general council of the tribe expressed at a duly convened meeting."

Is Yellowtail Dam an "additional irrigation system" within the meaning of the Crow Allotment Act of 1920? In my opinion this question must be answered in the negative. Yellowtail Dam is a

---

4. In a companion case, United States v. 21,250 Acres of Land, More or Less, Situate in Cattaraugus County, State of New York, The Seneca Nation of Indians, D.C.W.D.N.Y., 161 F.Supp. 376, the court had entered an order for the surrender of possession, pursuant to the provisions of 40 U.S.C.A. § 258a. The defendants moved the court to vacate the order for delivery of possession on the ground that the tribal lands of the Seneca Nation were not subject to condemnation. The court denied the motion, holding that the "power of eminent domain extends to Indian tribal lands, as it does to all lands privately owned within the United States."

multi-purpose project to impound waters for flood and silt control and power generation, as well as irrigation. It is a part of a comprehensive plan for the development of the Missouri River Basin for the benefit of the public and payment therefor will not be a charge against any tribal funds. It is not an irrigation system or additional irrigation system for the benefit of the Crow Indian land for which payment would be made from tribal funds.

With respect to the 1946 Act, the title and history of the Act are significant. The title is "To provide for adjustments in connection with the Crow Irrigation Project, Crow Indian Reservation, Montana." It is accordingly apparent from the title itself that the Act was intended to apply to the existing irrigation projects. Sec. 9 would prevent new construction on the Crow project without prior consent. Congress had authorized construction of Yellowtail Dam at the previous session in 1944. The 1946 Act makes no reference to Yellowtail Dam, but does refer specifically to the Crow Irrigation Project. Moreover, it appears from the hearings before the House Committee on Indian Affairs in 1946 that the Crow Tribe was concerned primarily (1) with some settlement of the problem of charges for construction and maintenance of irrigation projects theretofore constructed; and (2) that no further or additional irrigation systems be constructed on the reservation which were not desired by the owners of the lands benefitted and which might result in similar assessments against their lands. In my opinion, the 1946 Act was not intended to apply to the construction of Yellowtail Dam.[5]

■ The Flood Control Act of December 22, 1944, authorizing the development of the Missouri River Basin, including Yellowtail Dam, after providing that reclamation and power development should be governed by the Federal Reclamation Laws, recites "except that irrigation of Indian trust and tribal lands, and repayment therefor, shall be in accordance with the laws relating to Indian lands". It appears to me that here again Congress recognized the distinction between the construction and development of reclamation and power projects, including Yellowtail Dam, and the construction and development of irrigation projects for the irrigation of Indian lands.

Conceivably a situation may later arise in connection with the construction of an irrigation system on the Crow Reservation where the 1946 Act may be applicable, and either consent of the tribe or further action by Congress might be required. It is unnecessary to determine that question at this time.

Should Water-Power Value Be Allowed As a Part of Just Compensation?

It is plaintiff's contention that United States v. Twin City Power Co., 1956, 350 U.S. 222, 76 S.Ct. 259, 260, 100 L.Ed. 240, is controlling and that under that decision the just compensation which the Fifth Amendment requires to be paid does not include water-power value.

Defendants contend that this case is distinguishable and has no application (1) because the Twin City decision rests on the ground that the river in question was a navigable stream, whereas the Big Horn River is not navigable; (2) even on the assumption that the Big Horn River is navigable, the Twin City case is still inapplicable because the Government does not have any "dominant servitude" over navigable streams within the Crow Indian Reservation; and (3) even assuming that the Big Horn River is navigable and that the United States has a "dominant servitude" over it within the Crow Reservation, plaintiff would still be required to pay full water-power value because: (a) Congress in Section 10 of the Crow Allotment Act promised the Crow Tribe full water-power value; and (b) the United States owes special duties to the Crow Tribe, arising out of treaties,

---

5. See Memorandum Opinion of Solicitor of Interior Department, dated February 3, 1954 (M36148).

legislation, and the historical relationship between the Federal Government and Indian Tribes.

In the Twin City Power Co. case, the condemnation proceedings were "part of the procedure for completion of the Clark Hill Project on the Savannah River, a navigable stream" * * *, a project "serving multiple purposes—hydroelectric, flood control, and navigation" * * *. "Congress approved this project as part of 'the comprehensive development of the Savannah River Basin for flood control and other purposes'."

The Court of Appeals had concluded that the improvement in navigation was not the purpose of the taking but that the project was designed to serve flood control and water power development (215 F.2d 592, at page 597), but the Supreme Court held that, "The decision of Congress that this project will serve the interests of navigation involves engineering and policy considerations for Congress and Congress alone to evaluate"; and that, "If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced" (citing cases). The court continued: "As we said in the Appalachian Power Co. case [United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243] 'flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control.' 311 U.S. at page 426, 61 S.Ct. at page 308."

The court held further that "the interest of the United States in the flow of a navigable stream originates in the Commerce Clause" and that "the power is a dominant one which can be asserted to the exclusion of any competing or conflicting one" and "is a privilege which we have called 'a dominant servitude'." With reference to the application of the rule of "dominant servitude" the court said in part: "An effort is made * * * to establish that this private land is not burdened with the Government's servitude. The flaw in that reasoning is that the landowner here seeks a value *in the flow of the stream,* a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses." The opinion concluded:

"The Court in the Chandler-Dunbar case [United States v. Chandler-Dunbar, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063], emphasized that it was only loss to the owner, not gain to the taker, that is compensable. 229 U.S. at page 76, 33 S.Ct. at page 677. If the owner of the fast lands can demand water-power value as part of his compensation, he gets the value of a right that the Government in the exercise of its dominant servitude can grant or withhold as it chooses. The right has value or is an empty one dependent solely on the Government. What the Government can grant or withhold and exploit for its own benefit has a value that is peculiar to it and that no other user enjoys. Cf. United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 273 et seq., 63 S.Ct. 1047, 1051, 87 L.Ed. 1390. To require the United States to pay for this water-power value would be to create private claims in the public domain."

With respect to the question of navigability, counsel for plaintiff argue that the disallowance of water-power value in the Twin City case was not predicated upon the navigability of the particular stream, but rather upon the dominant control of the Federal Government over the stream, and that, "The asserted right to utilize the power inherent in the flow of the Big Horn River is subject to the dominant control of the United States and may be exercised only with the consent and at the election of the United States, whether the stream may be navigable or non-navigable." Defendants contend that the Government has no "dominant control—in terms of a servitude which frees it from liability over non-navigable streams".

For the reasons hereinafter set forth, it is my opinion that the Twin City

Power Co. case is not controlling, regardless of whether the Big Horn River is navigable or non-navigable. It must be recognized, however, that a higher court may conclude that the question of whether water-power value may be considered in determining just compensation depends upon whether or not the river is navigable. It seems advisable accordingly to determine the question of the navigability of the Big Horn River, and a hearing on this issue will be held as provided in order entered with this opinion.

The next question presented is whether the United States has a dominant control over the Big Horn River on the Crow Indian Reservation, regardless of whether it is a navigable or non-navigable stream. Clearly the Twin City Power Co. case involved a navigable stream. The difference between a navigable and non-navigable stream was recognized in United States v. Kansas City Life Ins. Co., 1950, 339 U.S. 799, 70 S.Ct. 885, 890, 94 L.Ed. 1277, which involved land on a non-navigable tributary of a navigable river. In the interest of navigation, the United States had constructed a dam which maintained the river continuously at ordinary high water level. In holding that the navigation servitude did not extend to land beyond the bed of the navigable river, the court said in part:

"It is not the broad constitutional power to regulate commerce, but rather the servitude derived from that power and narrower in scope, that frees the Government from liability in these cases * * * the owner's use of property riparian to a navigable stream long had been limited by the right of the public to use the stream in the interests of navigation * * *. This has applied to the stream and to the lands submerged by the stream. There thus has been ample notice over the years that such property is subject to a dominant public interest. This right of the public has crystallized in terms of a servitude over the bed of the stream. The relevance of the high water level of the navigable stream is that it marks its bed. Accordingly, it is consistent with the history and reason of the rule to deny compensation where the claimant's private title is burdened with this servitude but to award compensation where his title is not so burdened".[6]

Has there been "ample notice over the years" that the property involved in this action "is subject to a dominant public interest"? In my opinion, this question must be answered in the negative. No case has been cited holding that a "dominant servitude" exists in the United States over tribal interests in streams on an Indian reservation. On the contrary, the treaties, legislation and course of dealing with the Indians generally and with the Crow Tribe in particular, lead to the opposite conclusion.

The lands sought to be condemned are included within the boundaries of the territory set aside for the use of the Crow Tribe of Indians pursuant to the Fort Laramie Treaty of September 17, 1851, and the Treaty of May 7, 1868, supra. The latter treaty recites in Article 2, 15 Stat. 650, "The United States agrees that the following district of country, to wit (describing) * * * shall be, and the same is, set apart for the absolute and undisturbed use and occupation of the Indians herein named * * *".

The United States by these treaties and others, and through a course of dealing with the Crow Tribe, has recognized in the land now sought to be condemned an aboriginal Indian title in the Crow Tribe and its right of occupancy, possession, and use of the territory, including the development of water power.[7] The land has not been allotted to individual Indian owners, but has remained in tribal ownership pursuant to Sec. 10 of the Crow Allotment Act of 1920 (Act of June 4, 1920, 41 Stat. 751)

6. See also, United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746.

7. See Findings of Fact by the Indian Claims Commission in The Crow Tribe of

reading: "Any unallotted lands on the Crow Reservation chiefly valuable for the development of water power shall be reserved from allotment or other disposition hereunder, for the benefit of the Crow Tribe of Indians."

In Winters v. United States, 1908, 207 U.S. 564, 28 S.Ct. 207, 211, 52 L.Ed. 340, the court held that a reservation of the waters of the Milk River (a non-navigable stream on the northern boundary of the reservation) for irrigation purposes in favor of the Indians of Belknap Reservation was implied from an agreement by which the Indians ceded their lands to the United States, except for a small tract set apart as a reservation. In so holding, the court raised this pertinent question: "The Indians had command of the land and the waters,—command of all their beneficial use, whether kept for hunting, 'and grazing roving herds of stock,' or turned to agriculture and the arts of civilization. Did they give up all this? Did they reduce the area of their occupation and give up the waters which made it valuable or adequate?"

In United States v. Shoshone Tribe, 1938, 304 U.S. 111, 58 S.Ct. 794, 797, 82 L.Ed. 1213, the court held that the right of the Shoshone Tribe under the Treaty of July 3, 1868, 15 Stat. 673, included mineral and timber resources of the reservation. That treaty, as here, provided that the lands were set apart for the "absolute and undisturbed use and occupation" of the tribe. The court said in part:

"* * * the United States granted and assured to the tribe peaceable and unqualified possession of the land in perpetuity. * * *

For all practical purpose, the tribe owned the land. * * * The right of perpetual and exclusive occupancy of the land is not less valuable than full title in fee. * * * The words of the grant, coupled with the government's agreement to exclude strangers, negatives the idea that the United States retained beneficial ownership. * * * As transactions between a guardian and his wards are to be construed favorably to the latter, doubts, if there were any, as to ownership of lands, minerals, or timber would be resolved in favor of the tribe."

In United States v. Walker River Irr. Dist., 9 Cir., 1939, 104 F.2d 334, 339, the court held that, even though the Indian reservation was established by departmental action, not by treaty, the establishment involved "an implied reservation of water to the extent reasonably necessary to supply the needs of the Indians". The opinion in that case contains the following language pertinent to the question here presented:

"Treaties with the Indians and statutes disposing of property for their benefit have uniformly been given a liberal interpretation favorable to the Indian wards. Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Alaska Pacific Fisheries v. United States, supra [248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138]; United States v. Nez Perce County, 9 Cir., 95 F.2d 232. The rule has its basis in the obligation which the Government has assumed toward a dependent people. * * * It was pointed out in the illuminating opinion of

Indians v. The United States of America, Docket No. 54, decided June 11, 1954; "5. At the time that the treaty of 1851 was negotiated and entered into all of the lands involved in and described in the treaty were by the United States recognized generally to be lands held and occupied by Indians from time immemorial, held by them by aboriginal Indian title"; "12. The treaty of Fort Laramie is not merely a treaty of amity and an agreement between the Indian

tribes themselves, but by said treaty and the manner of its negotiation and the acts and conduct of the defendant, the United States of America, immediately before and after the execution and ratification of said treaty, defendant accepted, acknowledged, ratified and confirmed petitioner's aboriginal Indian title and right of occupancy, possession and use of the territory * * *." See 42 C.J.S. Indians § 28, p. 688 for definition of aboriginal title.

Attorney General (now Justice) Stone of May 12, 1924 (Opinions of Attorneys General, vol. 34, p. 171), that doubts whether the reservation of lands for the Indians included rights to hidden or latent resources, such as minerals, petroleum or water power, have, as a practical matter, uniformly been resolved in favor of the Indians." (104 F.2d at pages 337, 338).[8]

On the basis of the treaties between the United States and the Crow Tribe of Indians, the provisions of the Crow Allotment Act of 1920, and the foregoing cases, I am compelled to reject plaintiff's theory of dominant control. It is my opinion that the rule of Twin City Power Co. case would in any event be limited in its application to a navigable stream. If it should be determined that the Big Horn River is non-navigable, that conclusion alone would be sufficient to distinguish the instant case from the Twin City Power Co. case.

### Crow Allotment Act of 1920.

Assuming, arguendo, that the Big Horn River is navigable, I am still of the opinion that the rule of the Twin City Power case is not applicable by reason of the provision in Sec. 10 of the Crow Allotment Act of 1920 that the lands "chiefly valuable for the development of water power shall be reserved from allotment or other disposition hereunder, for the benefit of the Crow Tribe of Indians". In effect the Twin City case itself recognizes the power of Congress to provide for water-power value in stating that "* * * the landowner here seeks a value in the flow of the stream, a value that inheres in the Government's servitude and one that * * * the Government can grant or withhold as it chooses". [350 U.S. 222, 76 S.Ct. 261.] While there is no express grant of water-power value, Congress has recognized a property right of the Crow Tribe in water-power value of the lands to be condemned.

Plaintiff urges a strict interpretation of Sec. 10 of the Crow Act and contends that "the only conclusion that may be drawn is that Sec 10 contemplated that unallotted lands which might be valuable for the development of water power would be reserved from allotment or other disposition, but would be held as communal property of the tribe subject to disposition only with the approval of the Government, either by Congress or the Secretary of the Interior."

Counsel for both parties refer to the Federal Power Act (41 Stat. 1063, as amended, 16 U.S.C.A. § 791 et seq.) which contains the following proviso in Sec. 10(e) (16 U.S.C.A. § 803(e):

"*Provided,* That when licenses are issued involving the use of Government dams or other structures owned by the United States or tribal lands embraced within Indian reservations the Commission shall, subject to the approval of the Secretary of the Interior, * * * and, in the case of such tribal lands, subject to the approval of the Indian tribe having jurisdiction of such lands as provided in section 476

---

8. In Montana Power Co. v. Rochester, 9 Cir., 1942, 127 F.2d 189, 191, the court construed a treaty which reserved for the benefit of the Flathead and other Indians a tract of land the northern boundary of which bisected Flathead Lake so that the southern half was in the reservation. The court held that, "Whether the ownership was originally in the Indians or in the United States, it is certain that by the treaty United States undertook the whole title to the reserved area, including the bed of the southerly half of the lake, in trust for the confederated tribes". In United States v. Powers, 9 Cir., 1938, 94 F.2d 783, 785, the court said in part: "The Crow Indian Reservation was established by a treaty between appellant and the Crow Indians dated May 7, 1868, 15 Stat. 649. There was in the treaty no express reservation of water for irrigation or other purposes. There was, however, an implied reservation. (citing Winters v. United States, infra [207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340].) The implied reservation was to the Indians not to appellant (United States)."

·of Title 25, fix a reasonable annual ·charge for the use thereof * * *".

Counsel for defendants in their pre-trial memorandum call attention to the :fact that pursuant to the provisions of :Section 10(e) of the Federal Power Act, supra, "the Flathead Indians (in connec-tion with the building of Kerr Dam) and the Warm Springs Indians (in connec-tion with the building of Pelton Dam) have received from the power companies for their tribal lands annual rentals of :substantial value, which reflect full pow-·er site value." [9]

■ Counsel for plaintiff contend ·quite properly that the Crow Tribe is not entitled to more than just compensa-tion because of the Federal Power Act. It is apparent, however, that the effect ·of that Act was considered in connection with the enactment of Sec. 10 of the ·Crow Allotment Act. Counsel for plain-tiff, in their pre-trial memorandum, quote from the testimony of Mr. Merritt, As-sistant Commissioner of Indian Affairs before the Senate Committee, and from a statement by Senator Henry L. Myers ·of Montana before the Senate in support ·of an amendment to strike the provisions ·of Sec. 10 requiring the consent of the tribal council to the leasing or other dis-position of the lands. With particular reference to the Federal Power Act, Mr. Merritt said: "There is pending before ·Congress now the power-leasing bill (the Federal Power Act), and that bill will take care of the power sites on the reser-vation, and the proceeds will go to the Indians. If that bill is amended as I have suggested, the Secretary may super-vise that leasing and the Indians will be protected." [10]

That portion of Senator Myers' state-ment relating to the Federal Power Act, reads: "Under the water-power bill passed by the House and now pending be-fore the Senate, the control of water-power sites is vested in a commission consisting of the Secretaries of the In-terior, Agriculture, and War. Under ex-isting law, the control of water-power up-on the public domain, including Indian lands, is under the Secretary of the In-terior. The Indians and their welfare also come under his supervision and con-trol." [11] It seems unlikely that Mr. Mer-ritt or Senator Myers, in their discussion of the Federal Power Act, envisioned the situation here presented, where the Gov-ernment seeks by condemnation to ac-quire the dam site from the Indian Tribe rather than lease it for the benefit of the tribe.[12]

■ To adopt plaintiff's narrow con-struction of Sec. 10 of the Crow Allot-ment Act would render it meaningless in an action for condemnation. If the same property were leased, as was done in the case of the Flatheads and Warm Springs Tribes, the tribe here would receive a reasonable rental annually for the use of the dam site, and the Secretary of the Interior would protect the rights of the tribe in making certain that such rental

9. See Senate Report No. 216, 85th Cong. 1st Sess.

10. Senate Report No. 219, 66th Cong. 1st Sess. pp. 17 and 18.

11. Congressional Record, Vol. 58, part 7, 66th Cong. 1st Sess. pp. 7174, 7175.

12. The Secretary of the Interior, giving Congress his written views on a bill to compensate the Crow Tribe for Yellow-tail Dam Site, said: " * * * situations involving acquisition for reservoir pur-poses of tribal property present unique ·cases. The United States and particular-ly this Department in such a case oc-·cupies a dual role. On the one hand, its relationship with the tribe is, in many respects, analogous to that of a trustee, the nature of congressional power over tribal property being described by the highest court as that of a guardian or trustee (Morrison v. Work, [1925], 266 U.S. 481 [45 S.Ct. 149, 69 L.Ed. 394]; Nadeau v. Union Pacific Railroad Co., [1920], 253 U.S. 442 [40 S.Ct. 570, 64 L.Ed. 1002]. On the other hand, the United States, while occupying such a trustee relationship, seeks to acquire from the tribe its possessory rights in order that the property may be devoted to the purposes of the project for which it is required." Senate Report 216, 85th Cong. 1st Sess. pp. 9, 10.

was obtained. Yet here, the Government takes the position that it has the right to condemn, but that water-power value may not be considered in determining just compensation and that the tribe would be limited to what, in effect, would be a nominal value for grazing purposes.[13] It is inconceivable that Congress intended such a result when it recognized in Section 10 of the Crow Allotment Act that those lands "chiefly valuable for the development of water power" should be reserved from allotment or other disposition for the benefit of the Crow Tribe of Indians.[14]

Counsel for plaintiff cite a number of cases [15] supporting their contention that the Indians stand in no different position than any other property owner in the event of condemnation. In most of these cases the court held that Indian lands may not be taken "without just compensation", and that Indians are "not excepted from the protection guaranteed by the Constitution". None of them purport to determine the elements of damage or value recoverable as just compensation. While it is true that Indians are entitled to the same treatment in condemnation actions as other landowners, this does not mean that Congress may not recognize or provide for values which the court should consider in determining just compensation. In my opinion, in the Crow Allotment Act of 1920, Congress did recognize property rights of the tribe in lands used chiefly for water power, and these property rights may not be overlooked by the court in determining just compensation. It is not a case of paying more than "just compensation", but a recognition that by reason of the special provisions of this Act water-power value is a part of just compensation.

13. It is interesting to note that on the question of the right to condemn, defendants urge a strict interpretation of applicable statutes in contending that there must be express statutory enactments authorizing condemnation. On the question of whether water-power value may be included, plaintiff insists upon a strict interpretation of the Crow Allotment Act. It appears to me that a reasonable interpretation of all applicable statutes manifest an intention of Congress to permit condemnation and also permit the recovery of water-power value.

14. See Senate Report 700 of the 84th Cong. 1st Sess., as quoted in Judge Pray's Opinion (152 F.Supp. at page 863); and Report of the Committee on Interior and Insular Affairs in reporting favorably S.J.Res. 12, "Transfer of Right-of-Way for Yellowtail Dam and Reservoir" (S.Rept. No. 216, 85th Cong. 1st Sess.): "It is the committee's judgment that Section 10 * * * is a specific recognition by the Congress that the Crow Tribe has vested property rights in the power-site value of the lands * * * The committee finds that the 66th Congress, in providing for the allotment of Crow tribal lands, recognized the special value of the water-power site in question here, reserved it from allotment, and vested it as a property right of the Crow Tribe. In the present instance, since the lands involved are Indian lands, and since their power-site values have been specifically recognized and vested by the Federal Government in the tribe, it is submitted that as a matter of law, as well as of equity, such values must be considered in determining compensation for the lands taken." While S.J.Res. 12 was not enacted into law and the report of the committee is not controlling, it is interesting to note the committee's comments.

See also testimony of Solicitor of the Interior before the Senate Committee on Interior and Insular Affairs (84th Cong. 1st Sess. Hearings on "Yellowtail Dam—Hardin Unit, Montana", pp. 107–108), where he said: " * * * it is a very profound question and, to these Crow Indians a very vital legal question, as to whether or not this power-site feature is a compensable item. If it is, they get a lot of money; in anybody's language they get a lot of money. If it is not, if you are going to step in there and condemn the land and only pay the naked land value, then Senator, so far as the Department is concerned, and as the guardian of Indian affairs, I think we would all hestitate to do that."

15. Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295; United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331; Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; Henkel v. United States, 237 U.S. 43, 35 S.Ct. 536, 59 L. Ed. 831.

**Should the Issue of Just Compensation be Referred to Commissioners?**

Rule 71A(h) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides in part that where there is no specially constituted tribunal for the determination of the issue of just compensation, "any party may have a trial by jury of the issue of just compensation by filing a demand therefor within the time allowed for answer or within such further time as the court may fix, unless the court in its discretion orders that, because of the character, location, or quantity of the property to be condemned, or for other reasons in the interests of justice, the issue of compensation shall be determined by a commission of three persons appointed by it * * *. Trial of all issues shall otherwise be by the court". The plaintiff has filed a demand for a trial by jury. The defendants contend that the "character, location and quantity" of the property involved, and other reasons, require reference to commissioners in the interest of justice.

As stated in Moore's Federal Practice, Vol. 7, p. 2793, Sec. 71A.90(3): "The cast of the Rule favors jury trial of the issue of just compensation, where any party, condemnor or condemnee, files timely demand therefor; but the Rule is flexible and the district court, for good cause shown, may refer the issue of just compensation to a commission."

■ This rule was construed by the Court of Appeals of the Tenth Circuit in United States v. Waymire, 1953, 202 F.2d 550, 552, as follows: "Under such provision in the rule, any party to a condemnation proceeding is ordinarily entitled as a matter of right to trial by jury of the issue of just compensation * * * if demand therefor is made within the time fixed * * * and where the demand is seasonably made, its denial constitutes error unless, due to the character, location, or quantity of the property to be condemned, or some other reason in the interest of justice, the court in the appropriate exercise of its sound judicial discretion appoints a commission * * *. But in the exceptional case where extraordinary circumstances or conditions exist with respect to the character, location, or quantity of the property to be condemned, or for other reason in the interest of justice, the court may in its discretion appoint a commission to determine the issue of just compensation." [16]

The application of the rule was also considered at length in United States v. Cunningham, 4 Cir., 1957, 246 F.2d 330, 332. There, as here, the plaintiff had demanded a jury trial. The trial court appointed commissioners and their appointment was sustained, although the case was remanded for other purposes. The court said in part: "The trial judge found here that the interests of justice required the appointment of the commission and this finding was made upon reasons appearing in the case and set forth in his order of appointment. There can be no question but that they were adequate. The quantity of the land, its availability for beach residential devel-

---

16. See also United States v. 1,584.11 Acres of Land, etc., D.C.E.D.S.C.1956, 141 F. Supp. 720, 721, where the court said: * * * "From reading the historical outline of the adoption of the rule as set forth in 28 U.S.C.A., it appears that neither the advisory committee nor the Supreme Court felt that the exact circumstances and conditions under which a case should be referred to a commission could be appropriately spelled out and, accordingly, determined that the rule should be flexible enough to meet the endless variety of situations which might arise. It seems to me that the rule clearly intends that where there are uncomplicated conditions to be considered in determining just compensation, trial by jury must be granted if demanded by either of the parties, but that in exceptional cases where unusual circumstances or conditions exist with respect to the character, location or quantity of the property to be condemned or where for other reasons the interest of justice would better be served the Court may exercise its discretion in the appointment of a commission to determine the issue of just compensation."

opment, the elements of value presented by its availability for hunting and sport fishing, the question as to whether the discovery of ilmenite added to its value, the importance of its being carefully gone over by those who were to value it and the impracticability of having a jury do this in view of its distance from the place where the nearest federal court was held, —all these things taken together certainly justified the appointment of a commission, which would not only serve the convenience of parties and witnesses and make a personal examination of the premises, but which, composed as it was of a distinguished lawyer and two experienced real estate dealers, would bring to the difficult questions of valuation presented an expertness which could not be expected of a jury. Certainly the appointment of the commission could not be held an abuse of discretion." (Citing cases.)[17]

In the instant case the land consists of 5,677.94 acres, more or less, on the Crow Indian Reservation, to be used for the construction and maintenance of "a dam and reservoir with appropriate facilities in furtherance of the full conservation, control and use of water resources of the Missouri River Basin." It is located on the Big Horn River, which has worn a course through a rugged plateau-like area, forming a deep canyon, and extending for several miles. As noted above, it will be a multi-purpose dam, making water available for irrigation, power, municipal and industrial purposes, recreation, and flood control and river regulations. The case will involve technical and extended testimony relating to dam site or water-power value.

The dam site is located approximately 100 miles from Billings, Montana where

the case will be tried. For approximately 75 miles from Billings, the highway is paved. There is a dirt road from the paved highway to within approximately one mile of the dam site. It is necessary to walk this mile and in order to inspect the property adequately it would be necessary to walk an additional distance of several miles. It would be difficult for many jurors, particularly elderly persons, to examine the lands carefully. While a careful examination of the lands might not be essential to a determination of the case, in my opinion it would be desirable, in view of the size and nature of the project and the questions of value presented.

■ By reason of the character and location of the property to be condemned, the unusual elements of value involved, the difficult questions of valuation presented, the importance of having the property examined carefully by those who are to value it, and the impracticability of having this done by a jury, it is my conclusion that in the interests of justice, the issue of just compensation should be determined by a commission.

Determination of Navigability of Big Horn River.

Counsel for plaintiff take the position that the question of the navigability of the Big Horn River should be determined by the court; counsel for defendant, that it should be referred to commissioners.

It will be noted that Section 71A(h), after providing for the trial of the issue of just compensation, specifically provides that, "Trial of all issues shall otherwise be by the court". Counsel for defendant argue that the court could "well

17. Other cases in which the appointment of commissioners was ordered by the trial court or sustained by the Court of Appeals include: United States v. 3,928.09 Acres of Land, etc., D.C.W.D.S.C.1951, 12 F.R.D. 127; United States v. 1146.32 Acres of Land, D.C.S.D.Tex.1955, 132 F. Supp. 681; United States v. 4.43 Acres of Land, etc., D.C.N.D.Tex.1956, 137 F. Supp. 567; United States v. Wallace, 10 Cir., 1952, 201 F.2d 65; United States v. Chamberlain Wholesale Grocery Co., 8 Cir., 1955, 226 F.2d 492; Stephens v. United States, 5 Cir., 1956, 235 F.2d 467; United States v. 31,221.07 Acres of Land, etc., D.C.W.D.La.1956, 143 F. Supp. 385; United States v. Wateree Power Co., 4 Cir., 1955, 220 F.2d 226; Slattery Co. v. United States, 5 Cir., 1956, 231 F.2d 37.

regard the issue of navigability as comprehended within the issue of just compensation and included within the reference".

In United States v. Appalachian Power Co., 311 U.S. 377, 61 S.Ct. 291, 297, 85 L.Ed. 243, the court said: "To these circumstances (relating to the navigability of the river) certain judicial standards are to be applied for determining whether the complex of the conditions in respect to its capacity for use in interstate commerce render it a navigable stream within the Constitutional requirements. Both the standards and the ultimate conclusion involve questions of law inseparable from the particular facts to which they are applied. * * * The navigability of the New River is, of course, a factual question. But to call it a fact cannot obscure the diverse elements that enter into the application of legal tests as to navigability."

Counsel for plaintiff cite United States v. Cavalliotis, D.C.E.D.N.Y.1952, 105 F.Supp. 742, 744, where the court quoted from the Appalachian case and said: "The judicial standards to be applied determining whether a particular waterway is navigable within the meaning of the statute (33 U.S.C.A. § 409) 'involve questions of law inseparable from the particular facts to which they are applied'." Counsel for defendants cite Wisconsin Public Service Corp. v. Federal Power Commission, 7 Cir., 1945, 147 F.2d 743, certiorari denied, 325 U.S. 880, 65 S.Ct. 1574, 89 L.Ed. 1996, in support of their contention that the Appalachian case holds "that the ultimate finding of navigability is a factual question". Whether it be considered a mixed question of law and fact or a question of fact with diverse elements entering into the application of legal tests, the question of whether the Big Horn River is a navigable stream in my opinion is separate and distinct from the issue of just compensation and should accordingly be tried by the court.