**TRUCKEE–CARSON IRRIGATION DISTRICT, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 512–78.**

United States Claims Court.

Feb. 8, 1988.

E.J. Skeen, Salt Lake City, Utah, for plaintiff.

James J. Clear, Washington, D.C., with whom was Acting Asst. Atty. Gen., Roger J. Marzulla, for defendant.

## OPINION

### REGINALD W. GIBSON, Judge:

Truckee–Carson Irrigation District (TCID), a public corporation organized under the laws of the State of Nevada, brings this action, as the real party-in-interest,[1] to recover damages from the United States for breach of an alleged implied-in-fact contract commonly referred to as the "Nine-Point Program." The terms of said purported implied-in-fact contract were that the plaintiff would forego the *use* of water, diverted from the Truckee River through the Newlands Reclamation Project, for power production during the winter months in consideration of certain benefits to be received from defendant. In short, plaintiff avers that the defendant has been unjustly enriched to the extent that it (defendant) accepted the benefits of the implied-in-fact contract and, concomitantly, refused to perform and otherwise "compensate plaintiff for *its* losses" (emphasis added; see Petition, p. 1). The monetary claim asserted[2] is in the amount of $540,000.00 plus accrued interest.[3] In this connection, plaintiff also contends that this court has subject matter jurisdiction of this case under § 1491, Title 28 U.S.C.

This opinion addresses the United States' Motion For Judgment On The Pleadings with respect to which defendant contends that it is entitled to a favorable ruling because—(i) plaintiff's pleadings fail to facially reveal the existence of an implied-in-

fact contract (*i.e.*, implicitly defendant argues that the complaint is outside of the limited jurisdiction of this court); (ii) the issue of defendant's authority to order plaintiff to cease using winter-water for power production has been previously judicially decided adversely to plaintiff and favorably to the defendant; and (iii) moreover, assuming but not conceding jurisdiction, the statute of limitations bars the prosecution of said stale claim.

Because we believe, on thorough review, that fundamental jurisdictional issues are postured by the pleadings, we think it is proper to, *sua sponte*, treat defendant's motion as one for dismissal for lack of jurisdiction.[4] As it will appear more clearly hereinafter, we find that plaintiff has failed to meet its burden of demonstrating jurisdiction, and we therefore must dismiss the complaint for lack of subject matter jurisdiction.

### Facts

Consistent with established precedent, in ruling on a motion to dismiss for lack of subject matter jurisdiction, the court finds the following facts, *infra*.

On June 17, 1902, Congress passed what is popularly known as the Reclamation Act or the National Irrigation Act of 1902, 32 Stat. 388, *codified at* 43 U.S.C. § 371, *et seq.* (the Act). The purpose of the Act was to reclaim for agricultural purposes, through extensive federally-funded irrigation systems, the vast tracts of arid and semi-arid land that comprise many western states. *Nevada v. United States*, 463 U.S.

1. In its Response To Defendant's Motion For Judgment On The Pleadings, TCID averred that "[i]t filed the petition in this action solely as a representative of the landowners in the Newlands project area...." Nonetheless, nowhere in said petition does plaintiff contend that it was suing in a representative capacity. In fact, in paragraph 3 of the petition, TCID alleges that— "*Plaintiff,* by this action, *seeks* damages and compensation for *its* losses resulting from...." (emphasis added).

2. Prior to instituting suit in this court, plaintiff filed a claim with the Commissioner of Reclamation, U.S. Department of Interior. Said claim was denied on April 12, 1978.

3. In this court, plaintiff averred a plethora of laws, regulations, and contracts as to which its claim involves, such as—the Fifth Amendment to the U.S. Constitution; 43 U.S.C. § 371, *et seq.;* a contract between plaintiff and defendant dated December 18, 1926; a decree styled *Orr Water Ditch Company;* and the alleged implied-in-fact contract.

4. In the discussion, *infra*, the court sets out the rule of law for the conversion of defendant's motion for judgment on the pleadings into a motion to dismiss for lack of subject matter jurisdiction.

110, 115, 103 S.Ct. 2906, 2910–11, 77 L.Ed. 2d 509 (1983); *Henkel v. United States*, 237 U.S. 43, 49, 35 S.Ct. 536, 539, 59 L.Ed. 831 (1915). The Secretary of the Interior withdrew these areas from public entry during the construction of the irrigation projects and then reopened the lands under the homestead laws and conditions of the Act. *Nevada*, 463 U.S. at 115, 103 S.Ct. at 2910–11.

One of the first federal irrigation projects constructed under the Reclamation Act was the Newlands Reclamation Project (Newlands Project) in Nevada. This project was approved by the Secretary of the Interior (the Secretary) in 1903, to provide the necessary irrigation water from the Truckee River and the Carson River. Both rivers originate in the mountains of eastern California and flow northeastly into west central Nevada. The Carson River ultimately flows into Carson Sink. The Truckee River empties into Pyramid Lake which has no outlet. The Newlands Project was built to divert water from the Truckee and Carson Rivers into the Lahontan Reservoir for storage. From the Lahontan Reservoir the water is distributed, for beneficial irrigation, through over 400 miles of irrigation ditches. The Derby Diversion Dam serves the purpose of diverting Truckee's water into the Truckee Canal which ultimately transports said waters into the Lahontan Reservoir. There is also a dam and a power plant at the Lahontan Reservoir. The foregoing diversion by the dam of Truckee's water prevents it from flowing along its natural course into Pyramid Lake. As a consequence, this causes Pyramid Lake to lose water volume.

Historically, the scarcity of available water in these arid regions has led to substantial litigation over water rights. For example, in 1913, the United States brought such a suit in the U.S. District Court of Nevada to establish the rights of the Pyramid Lake Paiute Indian Tribe (Pyramid Indians) and the then incomplete Newlands Project to Truckee River water for irrigation. Following thereon, in 1926, the District Court entered a temporary order that provisionally established the water rights of the Newlands Project, the Pyramid Indians, and the defendants in that 1913 action, who included all other water users on the Truckee River. In 1944, after a serious drought, the District Court entered a final decision (*i.e.*, the *Orr Ditch* Decree) that adopted the parties' settlement agreement for allocation of Truckee's waters. Under the *Orr Ditch* Decree, the United States was entitled to divert a specified amount of water for irrigation of the Newlands Project.

However, at the time of said *Orr Ditch* Decree, the United States no longer represented the Newlands Project. The Truckee–Carson Irrigation District (TCID) had been formed, as a public corporation under the laws of Nevada, and had contracted with the federal government on December 31, 1926, to operate and manage the Newlands Project. This 1926 management contract was formed pursuant to the Act of December 5, 1924, *codified at* 43 U.S.C. §§ 500–501, which authorized the takeover of the management of irrigation projects *subject to any rules or regulations that the Secretary of the Interior might promulgate in the future.* The 1926 management contract also made clear, at paragraphs 7 and 34, that the Secretary *reserved the right* to make rules and regulations, and that TCID agreed to operate the irrigation project in accordance with *all* such rules and regulations. Further, under paragraph 32 of said contract, the United States *unequivocally* reserved the right to terminate the contract upon one year's written notice should TCID breach any of the contract terms.

Transferred to TCID from the United States by the 1926 contract was the care, operation, and maintenance of the following components of the Newlands Project: the Lahontan Reservoir, lands and dam; the Lake Tahoe Reservoir, lands and dam; the Derby Diversion Dam, lands and reservoir; the Lahontan power plant (subject to existing leases);[5] and all parts of the relat-

---

**5.** At the time the management contract was signed in 1926, a lease of the Lahontan power plant existed between the United States and the Canyon Power Company. Article 30 of the management contract empowered TCID to col-

ed irrigation systems as well as the power distribution lines. Additionally, TCID assumed liability for repayment of initial construction costs and acted as the fiscal agent of the government to collect the construction, operation and maintenance charges assessed against the individual tracts within the District that received irrigation water. In other words, TCID was primarily liable for all fees and acted to collect these fees from the District landowners (who received the benefits of the irrigation project) in order to reimburse the government for the initial construction costs of the project. The major function of TCID under the contract, therefore, was to deliver water for irrigation purposes to landowners within the District pursuant to the reclamation laws. To this end, the contract allowed TCID to divert an "equitable portion" of the waters decreed to the United States under the *Orr Ditch* Decree and gave the *lands* of TCID a "prior right to the economical and beneficial use of all such waters in sufficient quantity to properly irrigate 87,500 acres of land...." (1926 contract Article 35, emphasis added). The Ninth Circuit in *Truckee–Carson Irrigation District v. Secretary of Department of Interior*, 742 F.2d 527 (9th Cir.1984), *cert. denied,* 472 U.S. 1007, 105 S.Ct. 2701, 86 L.Ed.2d 717 (1985), interpreted the 1926 contract, when TCID challenged its termination in 1974 by the Secretary of Interior for the former's alleged substantial violation of regulations, as giving TCID only the right to *manage* the reclamation project subject to the Secretary's regulations and *no* direct ownership of any water rights. *Id.* at 530.

Prior to said litigation, in the 1960s, competition for Truckee's water was also ongoing due to the diversions of the Truckee River *from* Pyramid Lake *into* the Lahontan Reservoir. These diversions caused a decrease in the water level at Pyramid Lake. As a result thereof, the indigenous fish were unable to spawn and, therefore, became an endangered species. Because of this circumstance, the Pyramid Indians found their principal food source threatened. The Secretary, who is charged with the responsibilities of both managing the water supplies to the Newlands Project and protecting the interests of the Pyramid Indians in Pyramid Lake, sought to ameliorate the situation by engaging in negotiations with TCID, beginning in the 1960s, with a view towards reaching an agreement to minimize the diversion of the Truckee River and to restore Pyramid Lake. 32 Fed.Reg. 3098 (1967) (codified at 43 C.F.R. Part 418). Consistent with the objective of restoring Pyramid Lake to an acceptable level, the Secretary published operating criteria in 1967 for the Newlands Project that removed TCID's ability to divert and use Truckee River water solely to generate hydroelectric power.[6]

The upshot of the ongoing negotiations between the Secretary of the Interior and TCID was the so-called "Nine–Point Program." The Nine–Point Program was a pro*posed* amendment to the 1926 management contract, that allegedly included, *inter alia,* the following features: (i) TCID would operate the Newlands Project so as to maximize use of Carson River flows and *minimize* use of Truckee River flows; (ii) TCID would no longer use Truckee water solely to generate electric power; (iii) the government would rehabilitate Lahontan Dam and Reservoir, Derby Dam, Truckee Canal, Carson Diversion Dam and Tahoe Dam on a non-reimbursable basis; and (iv) the government would rehabilitate the project's distribution and drainage systems on a 50 percent reimbursable basis over a long, unspecified time period. Both TCID and the Secretary were aware that the proposed amendment to the 1926 contract would have to be approved by Congress before the Secretary could execute the

---

lect the monies due the government under the lease with Canyon Power Company.

**6.** 43 C.F.R. § 418.4(h), first published in 1967 at 32 Fed.Reg. 3098, provides:

"(h) Hydropower generation at Lahontan and V canal power plants shall be incidental only to releases or diversions of water for beneficial consumptive uses, except that power may be generated from water that would otherwise constitute uncontrollable spill or precautionary drawdown."

**366**

amendment as a viable document. This is an incontrovertible fact in that plaintiff avers the following at paragraph 10 of the Petition:

> A satisfactory draft of amendatory contract was prepared after negotiations ... *with the understanding* that the draft would be submitted to Congress for approval and authorization of its execution by the Secretary of the Interior.

(emphasis added). Plaintiff's Petition para. 10 and Defendant's Answer para. 10.

While in 1968 TCID's water users voted to authorize execution of the Nine–Point Program, as an amendment to the 1926 contract, and sent the proposed amendment to the Secretary, the latter took no action regarding causing same to be approved by Congress; nor did he personally sign the same. A few years after TCID's board voted to approve the proposed contract amendment, *i.e.*, early in the 1970s, the Pyramid Indians brought suit to challenge the Secretary's yearly operating criteria for the Newlands Project, alleging that these regulations diverted more water than required under the applicable court decrees. *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F.Supp. 252 (D.D.C. 1972 & 1973). In that case, the court held that the Secretary's operative regulations were improper as having no rational basis inasmuch as they allowed TCID to divert an excessive amount of water from the Truckee River. *Id.* at 256, 257. Because of the foregoing holding, the court caused new regulations to be promulgated early in 1973. These new regulations set an *upper* limit on the amount of water that TCID could divert from the Truckee River.

Within three months of the publication of the new operating criteria, TCID *intentionally* diverted more water from the Truckee River than these regulations allowed. *Truckee–Carson Irrigation District v. Secretary of Dept. of Interior*, 742 F.2d 527, 530 (9th Cir.1984), *cert. denied*, 472 U.S. 1007, 105 S.Ct. 2701, 86 L.Ed.2d 717 (1985). In view of this obvious transgression, the Secretary gave TCID the one-year notice of termination of the 1926 management contract as required by the 1973 regulations and as further stipulated in Article 32 of that contract as follows:

> In case of the breach of any of the terms or conditions of this contract by the District, *the United States reserves the right, upon one year's written notice to the District, to terminate this contract;* ....

Following the effective date of the termination (October 31, 1974), TCID challenged the termination by seeking equitable relief in the District Court of Nevada and on appeal to the Ninth Circuit. *Truckee–Carson v. Secretary*, 742 F.2d at 529. Both courts held that the Secretary *properly* terminated the 1926 management contract in 1974. *Id.* And after the termination of the 1926 contract in 1975, the government then notified TCID that the draft of the *proposed amendment* to the 1926 contract, *i.e.*, the Nine–Point Program, was no longer "viable."

### Contentions of the Parties
#### A. Plaintiff

Against this background, TCID contends, in this court, that it gave up its rights under the 1926 contract to use water solely to generate hydroelectric power in the *non-irrigation* season (*i.e.*, the winter months) in reliance upon the benefits promised to it by the government. These alleged promised benefits are contained in the *proposed* amendment to the 1926 management contract, the Nine–Point Program. In other words, argues plaintiff, the government accepted *TCID's property* (the right to produce hydroelectric power during the winter months) and received a benefit (more water flowed into Pyramid Lake than otherwise was entitled under existing regulations); therefore, plaintiff argues that an implied-in-fact contract can be inferred from the totality of the circumstances surrounding the so-called Nine–Point Program. According to plaintiff, the government *ordered* TCID to stop using water during the winter months to generate hydroelectric power on *February 21, 1967*, and TCID complied. But the breach of this implied-in-fact contract did not occur notwithstanding, says plaintiff, *until 1975* when the government repudiated the proposed amendments to

the 1926 contract, *i.e.*, the Nine–Point Program. Thus, plaintiff argues that the foregoing caused it to suffer a detriment in that it abstained from the production of salable hydroelectric power since the order of *February 21, 1967*, whereas the government breached in 1975 by reneging on its promise to visit certain benefits on it as a *quid pro quo.*[7]

### B. *Defendant*

The government meets plaintiff's contentions by moving for a judgment on the pleadings and arguing that, as a matter of law, no implied-in-fact contract ever arose between the parties, thus, this court has no jurisdiction to hear the action. Defendant bases its argument on two critical allegations: (i) that plaintiff admits in its pleadings that the Secretary issued regulations, that prohibited plaintiff from using water during the winter solely to generate electric power, *prior* to the time TCID's water users authorized execution of the Nine–Point Program as an amendment to the 1926 contract; and (ii) that both the Secretary and TCID were aware that the Secretary lacked authority, *without Congress' approval*, to make any amendment binding on the government with respect to the 1926 contract. Within the pleadings, defendant argues, plaintiff has freely admitted in its own Petition that Congress never approved the Nine–Point Program as a contract amendment. *See* para. 10 of the Petition. Thus, plaintiff's claim is facially defective, according to defendant, since the Petition concedes operative facts that unmistakably negate two of the *essential* elements of an implied-in-fact contract, *i.e.*, mutuality of intent to contract and authority to bind the government. Coupled with the foregoing, defendant also asserts the statute of limitations as an additional impediment to recovery since plaintiff's alleged injury occurred in 1967, when the Secretary's regulation first withdrew from plaintiff the right to utilize Truckee water to generate hydropower during the winter months. Since the subject Petition was filed in 1978, defendant contends that the claim is "stale" inasmuch as this court's six-year statute of limitations had run.[8]

In reply to defendant's motion for judgment on the pleadings, plaintiff challenges the propriety of the motion by asserting that defendant has based its motion on matters outside the pleadings. Relying on Rule 12(c) of the Claims Court, plaintiff urges, therefore, that defendant's motion *must* be treated by this court as a Rule 56 summary judgment motion, and consequently should be denied because of the existence of genuine issues of material fact regarding the requisite operative factual elements of an implied-in-fact contract.

### *Issues*

### A. *Procedural Issue*

In order to address the jurisdictional issues raised by defendant's motion for judgment on the pleadings, this court shall first address the procedural issue that plaintiff focuses on in its response to defendant's motion, *i.e.*, whether defendant's motion for judgment on the pleadings must be recharacterized as a Rule 56 motion for summary judgment since defendant's motion refers to matters outside the pleadings.

### B. *Jurisdictional Issue*

Having appropriately characterized and framed defendant's threshold procedural motion, *supra*, the court will next posture two jurisdictional issues: (i) whether an implied-in-fact contract based on the Nine–Point Program can indeed be inferred from the circumstances and conduct of the par-

---

7. Plaintiff appears to assert an alternative argument that the government was unjustly enriched through plaintiff's foregoing of its contract right to generate hydroelectric power during the winter months. This claim is clearly beyond the jurisdiction of this court in that plaintiff is asserting an implied-in-law contract, *i.e.*, a duty to be imposed by law to provide a remedy. *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278,

279, 69 L.Ed. 643 (1925); *see also Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241 (1970).

8. The Claims Court statute of limitations at 28 U.S.C. § 2501 requires that the claim be brought within six years of the date that the claim arose or accrued.

ties; and (ii) in determining whether the Claims Court's six-year statute of limitations has run, when did the government *first require* that TCID cease its use of water, in the winter, solely to generate hydroelectric power.

### Discussion

#### A. *Determination of Procedural Issue*

Defendant filed a motion for judgment on the pleadings in this court on February 14, 1986. Arguing that the proper procedural approach is for the court to treat defendant's motion as a Rule 56 motion for summary judgment, as required by Rule 12(c), in support of its position, plaintiff emphasizes that defendant's motion presented the following matters outside the pleadings: (i) the 1926 management contract; (ii) the opinion of the District Court of Nevada wherein that court denied TCID's challenge to the termination of the 1926 management contract; and (iii) the *Orr Ditch* Decree of 1944 that established the right of the United States to divert water from the Truckee River to the Newlands Project.

With respect to these matters which plaintiff represents as being outside the pleadings, the court finds that plaintiff also refers to *each* of the above-listed documents in either its own Petition and/or in its filing styled "Submission in Response to Standard Pre–Trial Order on Liability" which was furnished to the predecessor court on June 8, 1979, in response to the trial judge's order of March 14, 1979.[9]

Nonetheless, upon a close examination of the parties' pleadings and other filings, it is noted that under Claims Court Rule 12(h)(3) this court is *mandated* to, inasmuch as it "shall," dismiss the action "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter...." Thus, whereas here defendant strenuously alleges that plaintiff's pleadings *facially* show that no implied-in-fact contract ever arose, due to lack of authority and mutuality, defendant in substance is simply alleging that the complaint, as averred, is outside this

court's subject matter jurisdiction. Given the foregoing, the court finds that the threshold procedural issue here is the propriety of granting a dismissal for lack of subject matter jurisdiction, as opposed to passing on either a motion for judgment on the pleadings or summary judgment. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

■ In *McNutt*, the Supreme Court held that the trial court is *not* confined to the parties' pleadings regarding jurisdictional facts; but rather, the court on its own motion may search for the facts as they really exist once it has reason to doubt the jurisdictional allegations. *Id.* at 184, 56 S.Ct. at 783. In that case, plaintiff challenged a state statute seeking to regulate its business. On appeal, the Supreme Court found that plaintiff failed to allege any facts showing what loss to the business the enforcement of the statute would involve; therefore, the Court concluded that the complaint was devoid of the appropriate allegation of a jurisdictional requirement, *i.e.*, the jurisdictional amount. *Id.* at 181, 56 S.Ct. at 781. Since plaintiff failed to meet his burden of showing that he was within the subject matter jurisdiction of the Court, the Court remanded the case to be dismissed for lack of jurisdiction. *Id.* at 190, 56 S.Ct. at 785. In the instant case, then, the reference to matters outside the pleadings is not, *ipso facto*, a bar to a decision on a motion to dismiss premised on lack of subject matter jurisdiction. This is so because it is well settled that the "trial court is not bound by the pleadings of the parties." To the contrary, following *McNutt*, this court may "inquire into the facts as they really exist." *Id.* at 184, 56 S.Ct. at 783.

Of the utmost importance to a jurisdictional inquiry here is the settled fact that the subject matter jurisdiction of the Claims Court is very limited in that it is established by statute. 28 U.S.C. § 1491 (1973). *See also Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 272, 1

---

**9.** *See* Appendix for pertinent parts of plaintiff's pretrial submission.

L.Ed.2d 306 (1957). In order to be within the jurisdiction of this court, plaintiff must allege facts that demonstrate a claim against the United States founded upon the Constitution, an Act of Congress, an executive regulation, an express or implied contract, or upon liquidated or unliquidated damages. 28 U.S.C. § 1491(a)(1). As noted above, Rule 12(h)(3) mandates dismissal due to lack of subject matter jurisdiction. *See also Fidelity & Deposit Company of Maryland v. United States,* 2 Cl.Ct. 137 (1983). In *Fidelity,* a government contract case, this court, *sua sponte,* converted defendant's motion for summary judgment to a motion to dismiss for lack of subject matter jurisdiction in view of defendant's contention that plaintiff did not certify its claim as required by statute, and held that the Claims Court lacked jurisdiction. *Id.* at 142. In short, there the defendant challenged plaintiff's petition on the grounds that the jurisdictional allegations did not meet the statutory standard.

■ Similarly, in the case now under consideration, defendant moves for judgment on the pleadings, contending that plaintiff's allegations fail to meet the statutory jurisdictional standard of 28 U.S.C. § 1491(a)(1), for the reason that plaintiff's pleadings *facially show* that it cannot prove *all* of the indispensable elements of an implied-in-fact contract. When the court is confronted with a mischaracterized motion, such as here, it has the plenary power to disregard the title of the motion and may consider the motion on the basis of its substance. That is to say, courts should treat an improperly identified motion, that actually challenges the court's authority to hear the case, *as if* it properly raised the jurisdictional issue. *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 250 F.Supp. 926 (1966). In *Trio Process Corp.,* a patent infringement case, the court considered a pleading denominated as a "Motion To Strike" as a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim (*i.e.,* the defendant challenged the non-exclusive licensee's bringing of an infringement and unfair competition suit). In the case before this court, since Defendant's Motion For Judgment On The Pleadings truly, and in substance, goes to subject matter jurisdiction (*i.e.,* jurisdictional facts supporting an implied-in-fact contract are irremediably missing from the Petition), the court elects to treat said motion before us solely as a motion to dismiss for lack of subject matter jurisdiction.

■ First, we note that it is well settled that a motion to dismiss, for lack of subject matter jurisdiction, does not generally bear on the merits and is without prejudice. 10 Wright & Miller, *Federal Practice and Procedure,* § 2713 (1983). On the other hand, when the issue of subject matter jurisdiction is so inextricably intertwined with the merits that a decision on the jurisdictional issue constitutes at the same time a ruling on the merits, the courts have counseled against deciding the merits of the case summarily under the auspices of deciding the jurisdictional issue, without going to trial. *Continental Casualty Co. v. Department of Highways, State of Louisiana,* 379 F.2d 673 (5th Cir.1967); *see also Wade v. Rogala,* 270 F.2d 280 (3rd Cir.1959). However, in *Continental Casualty Co.,* the court carved an exception to the foregoing general rule of *not* dismissing a case where the jurisdictional issue is intertwined with the merits. There, *Continental Casualty* teaches that when it appears to the court, beyond a legal certainty, that the plaintiff cannot meet its burden with regard to the basic jurisdictional requirement, then the court can dismiss. *Id.* at 674. Implicit in this exception to the general rule is the concern of courts to assure the efficient administration of justice by meeting their obligation to effectively manage their case loads. Stated differently, the court would *unnecessarily* delay the dispensation of justice if it could determine at the outset of the litigation that plaintiff could not meet its jurisdictional burden, but nonetheless allowed the case to go to trial due to the intimate relationship between the merits and the jurisdictional issue, only to dismiss for lack of subject matter jurisdiction at the conclusion of the litigation. The sounder policy, we believe, is to allow the dismissal early-

on *if* the legal-certainty test can be clearly met. Compatible with the legal-certainty test is the rule that if the plaintiff avers jurisdiction generally, in its complaint, but subsequently alleges facts that clearly negate jurisdiction, in that circumstance the court should dismiss. *Gibbs v. Buck*, 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939).

In applying these rules to the issue here, this court has determined, *infra*, that plaintiff clearly fails to meet its jurisdictional burden, and, moreover, has alleged facts in its complaint that persuasively negate its general jurisdictional statement. We find that the jurisdictional issue is identical here with the substantive issue, *i.e.*, the existence of an implied-in-fact contract. However, due to our determination, to a legal certainty, of plaintiff's failure to carry its jurisdictional burden, as demonstrated below, the court must dismiss the complaint for want of subject matter jurisdiction.

B. *The Jurisdictional Issue—The Existence Of An Implied–In–Fact Contract*

 Plaintiff has alleged jurisdiction *generally* in its Petition by the assertion that an implied-in-fact contract exists between it and defendant. Nevertheless, TCID's subsequent allegations therein unequivocally negate the existence of certain critical elements indispensable to the creation of an implied-in-fact contract, as will be shown *infra*. To be empowered to decide the issues postured in this case, plaintiff, of course, has the burden of alleging fundamental jurisdictional facts going to each of the following requisite elements of an implied-in-fact contract: (i) mutual intent to contract; (ii) lack of ambiguity in offer and acceptance; (iii) consideration; and (iv) authority to contract on the part of the government agent. *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329, 339 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir. 1984). It is axiomatic, however, that plaintiff *cannot* establish an implied-in-fact contract simply and merely through referring to evidence of extensive *negotiations*, without more, wherein the parties *hoped* to

reach an agreement. *Id.* In *Pacific Gas & Electric Co.*, at 339, the court stated that:

> It is plaintiff's burden to prove that an implied-in-fact contract was made. Extensive negotiations in which the parties demonstrate hope and intent to reach an agreement are not sufficient in themselves to establish a contract implied-in-fact. . . .

Furthermore, no contract can be implied when, in the context of negotiations, the parties contemplated that *only* a *written* instrument would give life to any contractual relationship arising from preliminary negotiations. *Id.* In the context of ruling on a motion to dismiss for lack of subject matter jurisdiction, as we have recharacterized defendant's motion, we further emphasize that the presence of genuine issues of material fact do not prohibit the court from making jurisdictional fact findings. *Fidelity and Deposit Company of Maryland v. United States*, 2 Cl.Ct. 137 (1983). There, this court stated, at 145, that:

> Where a factual issue is raised in connection with a jurisdictional motion . . . , the court has broad discretion as to the method to be used in resolving the factual dispute. 6 J. Moore, Moore's Federal Practice § 56.03 (2d ed. 1982). "[T]he . . . court is not limited to an inquiry into *undisputed* facts. It may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction." *Williamson v. Tucker*, 632 F.2d [579] at 588 [5th Cir. (1980) ]. [Emphasis original.]

(footnote omitted).

 Here, on the face of the Petition, plaintiff alleges that after TCID's water users voted to authorize the "draft" amendment, the amendment was signed by plaintiff "with the *understanding* that the draft *would be submitted to Congress for approval and authorization* of its execution by the Secretary of the Interior" (Petition, para. 10) (emphasis added). Given this admitted circumstance, which belies the existence of an implied-in-fact contract absent approval and authorization, plaintiff was obviously aware that the Secretary himself did not have the requisite *authority* to bind the government to the terms of

the proposed amendment. Moreover, and in the same context, plaintiff admittedly knew that the amendment never went to Congress and thus was never approved by Congress which was, mutually understood to be, a conditioned precedent to the existence of such a contract. *Id.* Consequently, since Congress did not approve any amendment, the Secretary never was authorized to execute such. Thus, we find that even plaintiff's own pleadings facially allege adverse facts, *i.e.,* the awareness— of Congress' failure to approve the amendment and the Secretary's lack of authority which thoroughly negate the efficacy of its general jurisdictional allegation, as to the existence of an implied-in-fact contract.

Likewise, with respect to establishing the element regarding the want of ambiguity in the offer and acceptance, plaintiff blandly alleges only that *negotiations* occurred between the parties "extending over [a period of] several years" and that defendant obtained plaintiff's "cooperation." TCID fails to point to any clear and specific action that constitutes an offer and acceptance. Instead, the assertion is only that plaintiff stopped producing power in reliance on *the draft of an unapproved and unauthorized proposed contract amendment. Id.,* at paras. 10, 11. Furthermore, in 1967, the Secretary published the first operating criteria for the Newlands Project, codified at 43 C.F.R. Part 418. Within the context of these regulations, the Secretary states that:

> Extended *negotiations* have been undertaken with the Truckee–Carson Irrigation District for the purpose *of* reaching agreement regarding these matters. *These negotiations will be continued.*
>
> \* \* \* \* \* \*
>
> The rules and regulations in this part will be revised ... *to conform to any agreement reached* between the United States and the Truckee–Carson Irrigation District amending the existing contract with that District.

43 C.F.R. § 418.1(e) and (g) (emphasis added).

Clearly then, from the foregoing language of the regulation, only extended *ne-*

*gotiations* at that point in time had taken place between the parties without a binding and definitive offer and acceptance; thus, as of the time said regulations were published, in 1967, no agreement had been reached on the *proposed* amendment. Not only had no implied-in-fact contract arisen during the period 1960 through 1967, it is patently clear that none arose after 1967 and to the date of filing of the Petition herein. This is true because the identical language published in the 1967 operating criteria, *supra,* was also published each year thereafter at 43 C.F.R. § 418.1(e) and (g) for the consecutive period of 1968 through 1978, inclusively, indicating that the parties had still *not* reached an *agreement* regarding the terms of the proposed amendment to the 1926 contract which clearly manifested the want of a mutual intent to regard said putative amendment as a binding contract. Hence, the court is compelled to find from these circumstances that no agreement on the Nine–Point Program, as a contract amendment, can be inferred as having been reached between the parties. What exists here is merely plaintiff's reliance on evidence of nothing more than *extensive negotiations,* in *hopes* of the parties reaching an agreement, as probative of the existence of an implied-in-fact contract. *Pacific Gas & Electric Co.,* 3 Cl.Ct. at 339. This we find is totally insufficient to carry plaintiff's burden of establishing an implied-in-fact contract for purposes of fixing jurisdiction in this court.

■ Next, with regard to the element of consideration, plaintiff also fails since the court finds that in 1968, when TCID's electorate approved the Nine–Point Program as a proposed contract amendment, plaintiff at that point in time no longer had any rights under the contract to divert water *during the winter months* to generate electrical power. TCID alleges, in the petition, as its consideration proffered in the implied-in-fact contract that it gave up the contract right to generate hydropower during the *non-irrigation season.* However, not only does plaintiff fail to point to any provision in the 1926 contract that gave it this right, but, even assuming that

372

it did, the regulations of the Secretary published in 1967, at 32 Fed.Reg. 3098 (Feb. 21, 1967) and codified at 43 C.F.R. § 418.4(h), restricted TCID to generating power as an incident to "releases or diversions of water *for beneficial consumptive uses....*" (emphasis added.) [10] In this connection, and corroborative thereof, plaintiff has also admitted, in its Submission In Response To The Standard Pretrial Order On Liability, that "[t]he Secretary of the Interior ordered the plaintiff to stop the use of its water rights solely for the production of electric power in the winter season ... said order was made on February 21, 1967." [11] In essence, therefore, the admission of plaintiff unequivocally interprets and concedes the fact that the foregoing 1967 regulation prohibited TCID from diverting water during the nonirrigation season solely for the production of hydropower.

Defendant argues that this 1967 regulation (the "order") was validly promulgated under Article 34 of the 1926 contract which reserved the right of the Secretary to make such regulations. Further, the Ninth Circuit has held that "[i]n the 1926 contract, the Secretary explicitly reserved the right to issue regulations governing the operation of the Newlands Project" when TCID appealed the 1974 termination of their original contract. *Truckee–Carson Irrigation District v. Secretary of the Department of Interior,* 742 F.2d 527, 532 (9th Cir.1984), *cert. denied,* 472 U.S. 1007, 105 S.Ct. 2701, 86 L.Ed.2d 717 (1985). That court went on to hold that the Secretary had the authority under Article 34, *supra,* to change the operations of the Newlands Project to be more restrictive than under the 1926 contract and to issue regulations limiting the

amount of water that could be diverted from the Truckee River. *Id.* Consistent with the foregoing, the Secretary in 43 C.F.R. § 418.1(b) stated in 1967 that:

> The regulations in this part will initiate Departmental controls, lacking in the past, to limit diversions by TCID from the Truckee River ... and thereby make additional water available for delivery to Pyramid Lake.

In summary, defendant argues that the issue of the Secretary's power to make regulations prohibiting winter diversions from the Truckee River for electric power generation has been previously litigated between these parties. Consequently, issue preclusion [12] would prevent the re-litigation of this issue and the prior determination of the issue must be given full force and effect here. Conversely, plaintiff argues that issue preclusion would not apply since (i) the District Court of Nevada (in an unpublished opinion later affirmed by the Ninth Circuit) held only that the adoption of the operating criteria was within the authority of the Secretary and that the termination of the 1926 contract was proper; (ii) that holding does not relate to the validity of the breach of implied contract claim; and (iii) the restriction as to the generation of power through the diversion of water in the winter was based on the Nine–Point Program, and not on any regulation of the Secretary. The court is constrained to agree with defendant's argument for reasons expressed, *infra.*

■■■ The general rule of issue preclusion is that once issues have been litigated as an integral part of the claims raised and adjudicated in any other court, as here in

10. See note 6, *supra,* for text of 43 C.F.R. § 418.4(h).

11. Plaintiff furnished this submission to the then assigned judge of the predecessor Court of Claims in response to that judge's order of March 14, 1979. *See* Appendix for the relevant parts of this document.

12. Defendant has also argued for the application of *res judicata* but the cause of action in the Nevada District Court and the Ninth Circuit was a challenge to the termination of the *1926 contract* arising out of TCID's violation of the 1973 operating criteria. The claim here is for breach

of an *alleged* implied-in-fact contract due to a *1975* repudiation of said alleged contract (the Nine–Point Program amendment) by the government. The court finds that these two claims are separate, distinct, and unrelated in terms of their transactional bases. *See* Wright & Miller, *Federal Practice and Procedure,* § 4407 (1981). Further, *res judicata* would, apparently, not apply because plaintiff could not have obtained in the district court the full measure of monetary relief sought here. *Rowe v. United States,* 4 Cl.Ct. 39, 43 (1983).

the District Court, the decision on those issues is final and binding in any subsequent matter between the same parties. *Rowe v. United States*, 4 Cl.Ct. 39, 43 (1983) (citing *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)). In *Rowe*, the Claims Court found that issue preclusion applied to prohibit the litigation of an implied-in-fact contract to lease public lands for oil explorations after a previous district court decision held that a right to lease the land had never been established. In order for issue preclusion to apply: (i) the issue must have been "actually litigated" in the first action with a "full and fair opportunity" to be heard; (ii) the decision in the first action must have been final and on the merits; (iii) the issue was determinative to the decision on the merits of the prior action; (iv) the subsequent litigation is between the same parties; and (v) there are no special considerations of fairness or changes of law that would serve as exceptions to the general rule. Wright & Miller, *Federal Practice and Procedure*, § 4416 (1981).

■ In the case at bar, contrary to plaintiff's contentions, the issue of the authority of the Secretary to make restrictive regulations regarding the subject here has been judicially determined. Therefore, since the 1967 regulations "limit[ed] diversions by TCID from the Truckee River," they vitiated the alleged contract right that TCID could have given up as consideration prior to the 1968 vote of TCID's electorate to authorize execution of the Nine–Point Program, we find that no implied-in-fact contract arose here. These 1967 regulations, therefore, stand in stark contradiction to plaintiff's position that the restriction, as to the diversion of water in the winter for power generation, was solely based on the Nine–Point Program, and not on *any* regulation.[13] Given the foregoing, the court finds that TCID is precluded from arguing that its loss of the right to generate power in the winter was based on the Nine–Point Program since the Ninth Circuit has already held on the issue, actually litigated, that the authority of the Secretary to make such regulations was valid. Moreover, it is apparent that this determination was on the merits since TCID's challenge to the termination of the 1926 contract turned on the validity of such regulations which it had intentionally violated. The same parties were involved in both the Ninth Circuit litigation as are in the case currently before this court. And we find no exceptions in terms of fairness or subsequent changes of law to counsel against the imposition of issue preclusion. Hence, we must be bound by the determination of the Ninth Circuit that the Secretary had the power to make restrictive regulations on the method of operations of the Newlands Project. Thus, we hold that the restrictive regulations promulgated in 1967 removed any right TCID may have had to generate power in the winter prior to the 1968 vote of TCID's electorate to authorize the amendment to the 1926 contract. The element of consideration is, therefore, lacking to establish an implied-in-fact contract, since plaintiff possessed no such right to give.

■ Finally, in addition to the foregoing reasons, this court also finds that no implied-in-fact contract arose between the parties because the parties *both* clearly anticipated that their negotiations would result in a *written* agreement that would serve to amend the 1926 contract. Since, as stated above, these circumstances prohibit the implication of a contract based on the conduct of the parties, this court holds that no implied-in-fact contract arose. *See Pacific Gas & Electric Co., supra*, at 339, and cases cited in note 11. Hence, the complaint must be dismissed for lack of subject matter jurisdiction.

---

**13.** Moreover, in plaintiff's pretrial submission, TCID also takes the contradictory position that the "Secretary ... *ordered* the plaintiff to stop the use of its water rights solely for the production of electric power in winter season ... said order was made on February 21, 1967." Plaintiff went on to say in the same document, that it had not received the financial benefits of such power production since the order of February 21, 1967. This statement also contradicts plaintiff's statement that the revenue losses go back to 1960.

**374**

## C. *The Statute of Limitations*

Defendant has also raised the affirmative defense that the statute of limitations of the Claims Court, at 28 U.S.C. § 2501, bars TCID's claim. Our finding of no implied-in-fact contract ever arising, as a general proposition, makes this defense moot. However, even assuming *arguendo* that plaintiff could *prima facie* establish the existence of such a contract, we find that TCID's claim would nevertheless be barred, for the reasons discussed below. According to said statute, every claim, otherwise within the jurisdiction of the Claims Court, is barred if it is not filed *within* six years from the time that the claim in issue accrued. This statute is *also* jurisdictional, in that the court has no power to decide cases that were untimely filed. *Ater v. United States,* 6 Cl.Ct. 344, 348 (1984), *aff'd,* 770 F.2d 182 (Fed.Cir.1985). Moreover, the parties cannot waive this jurisdictional bar. *Id.* at 349.

The threshold inquiry here, therefore, is—when did TCID's claim accrue. Plaintiff argues that the implied-in-fact contract was breached *in 1975* only when it received written notice from defendant that the Nine–Point Program was no longer "viable." Defendant, in contrast, argues that any right that TCID may have had under the contract to generate power, during the non-irrigation season, was restricted *by the Secretary's regulations promulgated in 1967.* Consequently, defendant's position is that plaintiff's "injury" necessarily and unmistakably occurred in 1967 and, thus, its cause of action then accrued.

The court refers to plaintiff's own document, the Submission In Response To The Standard Pretrial Order On Liability, to find the time as to which plaintiff's injury occurred. As expressed above, the Supreme Court has given courts broad latitude to go beyond the pleadings to search for jurisdictional facts as they "really exist." *McNutt,* 298 U.S. at 184, 56 S.Ct. at 783. Hence, in our search for such facts as they "really exist," *supra,* we find that the restriction on plaintiff's right to divert water during the winter months for power generation actually occurred *in 1967,* as plaintiff has admitted in the referenced submission:

> The Secretary of the Interior *ordered* the plaintiff to stop the use of its water rights solely for the production of electric power in the winter season and the plaintiff ... complied with such order and has not received the financial benefits of such power production *since said order was made on February 21, 1967.*

(Pltf's Submission, p. 2; emphasis added). Consequently, plaintiff has voluntarily admitted as to the point in time the loss of revenue began to commence (*i.e.,* 1967) as being more than six years prior to the filing in 1978 in this court. Against this background, therefore, the statute of limitations would also, on these facts, operate to put plaintiff's claim outside this court's jurisdiction, and we so find.

### Conclusion

Treating Defendant's Motion For Judgment On The Pleadings as a motion to dismiss for lack of subject matter jurisdiction, and for the reasons expressed herein above, the court hereby grants the defendant's motion and orders the Clerk to dismiss the plaintiff's Petition. No costs.

IT IS SO ORDERED.

APPENDIX

# In the United States Court of Claims

TRIAL DIVISION

No. 316-74

(Filed: MAR 14 1979

| | | |
|---|---|---|
| TRUCKEE-CARSON IRRIGATION | ) | |
| DISTRICT | ) | STANDARD PRETRIAL ORDER |
| Plaintiff,* | ) | ON LIABILITY |
| v. | ) | (RULE 111) |
| THE UNITED STATES, | ) | WITH ADDITIONS** |
| | | *** |
| Defendant. | ) | |

IT IS ORDERED AS FOLLOWS:

1. **Plaintiff's Submission.** On or before ___90___ days, the plaintiff* shall furnish the following to the attorney of record for the defendant and to the trial judge:

*and* (a) A list accurately describing the documents that are relied on and are to be offered in evidence. The documents shall be numbered; and the list shall be accompanied by a copy of each document referred to therein, except that (1) no copy need be supplied to defendant's counsel where the plaintiff- reasonably believes that the defendant already has the original or a copy, and (2) the trial judge need not be provided a copy of any exhibit unless its admissibility is put in issue.

(b) A statement of the material matters of fact as to which it is believed that there is no substantial controversy between the parties, or which have been agreed to by the parties. The paragraphs of this statement shall be numbered.
** SEE Paragraph 6 below.

(c) A memorandum of contentions of fact and law, which shall comply with the following requirements:

(1) The contentions of fact shall consist of a concise statement of the ultimate, material facts which the plaintiff expects to establish, rather than a general statement of the claim or a repetition of the pleadings.

(2) The contentions of law shall be in the form of conclusions of law based on the ultimate facts which the plaintiff expects to establish, and, in addition, shall contain a brief statement of the points of law and a citation of the authorities relied upon in support of each point.

---

* The word "plaintiff," as used in this order, means "plaintiffs" in a case where two or more persons have joined together in filing a petition.

376

**SKEEN AND SKEEN**
ATTORNEYS AT LAW
538 EAST 4TH SOUTH
SALT LAKE CITY, UTAH 84102
TELEPHONE 363-8037
AREA CODE 801

E. J. SKEEN
R. C. SKEEN
THOMAS O. PARKER

J. O. SKEEN 1901-1971

June 8, 1979

Hon. David Schwartz
Trial Judge
U. S. Court of Claims
717 Madison Place, N. W.
Washington, D. C. 20005

 RE: Truckee-Carson Irrigation District, vs.
 United States of America, No. 512-78

Dear Sir:

 Enclosed is the plaintiff's submission ordered by the
Court in the above-referenced case.

 Respectfully,

 E. J. SKEEN
 Attorney for Plaintiff

EJS/bc

Enclosure

IN THE UNITED STATES
COURT OF CLAIMS

TRUCKEE-CARSON IRRIGATION
DISTRICT,

Plaintiff,

v. No. 512-78

UNITED STATES OF AMERICA,

Defendant.

PLAINTIFF'S SUBMISSION IN RESPONSE TO STANDARD
PRE-TRIAL ORDER ON LIABILITY

COMES NOW Truckee-Carson Irrigation District, herein referred to as TCID, the plaintiff above-named, by and through its attorney, E. J. Skeen, and responds to the Order of this Court, dated March 14, 1979, as follows:

1. (a) List of documents relied on and which will be offered in evidence: See attached list of documents, Attachment #1.

1. (b) Statement of material facts, no controversy between the parties:

The plaintiff operates, manages and controls the Newlands Reclamation Project pursuant to reclamation law and has done so since 1926, pursuant to the provisions of the contract between the plaintiff and defendant, dated December 18, 1926. The plaintiff owns or is the direct beneficiary of certain rights to the flow of the Truckee and Carson Rivers obtained under the laws of the state of Nevada for use on lands in the Newlands Project including certain water rights to produce electric power during the winter season.

The plaintiff, at the request of the defendant, participated in a program to benefit the Pyramid Lake Paiute Tribe of Indians, which program entailed the elimination of water rights in the winter season to produce electric power and certain other reduced uses of water by the plaintiff and the defendant agreed to provide for the plaintiff certain benefits all set out in the Nine Point Package Agreement.

The Secretary of the Interior ordered the plaintiff to stop the use of its water rights solely for the production of electric power in winter season and the plaintiff, in reliance on the cooperative program of the Nine Point Package Agreement, complied with such order and has not received the financial benefits of such power production since said order was made on February 21, 1967.

The District held an election on the proposed contract on December 3, 1968, and the electors of the District approved the contract and authorized its execution by the District.

It was not until July 25, 1975, that the plaintiff received notice that the defendant was not going to pursue the Nine Point Package Agreement, said notice being a letter to the plaintiff from the Commissioner of Reclamation.